CLARKE and others *vs.* THE BROOKLYN BANK and others.

---

The act incorporating the Brooklyn Bank authorized the commissioners, in case of an excess of subscriptions, to distribute the stock among the subscribers in such manner as a majority of such commissioners *should deem most advantageous to the interest of the institution.* The persons subscribing for 20 shares, or upwards, were not to receive less than 20 shares, unless such subscribers, or those for a less amount, exceeded the whole amount of stock. And no one commissioner was to be allowed more than 250 shares, if, without it, the whole stock was taken up. There was an excess of subscriptions. *It was held,* that the commissioners were authorized to take 250 shares apiece, and were not bound to give every subscriber some stock. They could not be compelled to make a rateable apportionment of the stock. The power given to them was broad and general.

*June 6, 1832.*

*Construction of a Bank charter in the apportionment of the stock.*

By an act of the Legislature, passed the twenty-fourth day of February, 1832, the Brooklyn Bank was incorporated, with

46

1832.

CLARKE
*v.*
BROOKLYN
BANK.

a capital of two hundred thousand dollars, divided into ten thousand shares of twenty dollars each. Seven commissioners were named in the act, to open books and receive subscriptions to the capital stock. The tenth section of the act makes it the duty of the commissioners " to distribute the stock among " the subscribers thereto; and in case there should be sub- " scriptions to more than the amount of such stock, it shall be " the duty of the commissioners to apportion the same among " the subscribers thereto, in such manner as a majority of them " shall deem most advantageous to the interests of the institu- " tion.. But no person who shall have subscribed for twenty " shares, or upwards, shall, upon such distribution, receive less " than twenty shares, unless the subscription for the last men- " tioned, (that is to say, twenty shares,) or a less number, shall " exceed the whole amount of the capital stock; nor shall " there be allowed to any one of the commissioners, directly " or indirectly, or to any one in trust for him, more than two " hundred and fifty shares, if, without such allowance, the whole " of the stock be taken up."

The act further provided, that the affairs of the corporation should be managed by thirteen directors, each of whom, at the time of his appointment, should be a stockholder of at least twenty-five shares on his own account; and that the first election of directors should be held at such time and place as the commissioners might direct, they giving, at least, fourteen days' previous notice of the election.

On the second, third, and fourth days of April, the commissioners opened a book for subscriptions, as directed by the act, and upwards of sixty thousand shares were subscribed for, exceeding the amount of the capital by more than a million of dollars. The subscriptions were by or in the names of two thousand two hundred and eighty-six persons, among them were the complainants, who subscribed for twenty shares each; and the subscriptions for twenty shares and a less number exceeded the whole amount of the capital stock.

Afterwards, the commissioners proceeded to distribute the stock, and, in so doing, they took to themselves each two hundred and fifty shares; apportioned to two hundred and ninety-

1832.

CLARKE
v.
BROOKLYN
BANK.

nine subscribers twenty shares apiece; to one hundred and sixty-seven subscribers each ten shares; to thirty-eight subscribers each five shares; to twenty-six subscribers each fifteen shares; to one subscriber seventeen shares; and to one subscriber three shares; making up the ten thousand shares.

To the complainants in the cause, and a great number of other subscribers, the commissioners apportioned no stock whatever, but returned them their deposits.

Six of the commissioners, (the other being absent,) signed a certificate of the apportionment to the above effect in the subscription book.

After the distribution was thus made, and the certificates of stock were delivered, the commissioners appointed the time and place for holding an election of directors. A set of directors were accordingly chosen.

Subsequent to this, the complainants filed their bill against the corporation, and the commissioners, and the persons chosen as directors. In it, they complained of the proceedings of the commissioners, upon various grounds, and, among other things, insisted, that the commissioners had no right, in the event of such an excessive subscription, to take to themselves the two hundred and fifty shares apiece and withhold from others the whole of what they subscribed for; and that they were bound, at least, to give to every subscriber some stock. The bill prayed the distribution already made might be set aside, a new distribution of the stock be ordered to be made by the commissioners, in conformity with the provisions of the charter, and, in the meantime, that the corporation and the directors thereof, individually, might be restrained from commencing the operations of the bank and from selling or transferring the stock or permitting it to be done.

The case came now before the court upon a motion for the injunction, under an order made, in the first instance, for the defendants to show cause.

Five out of the seven commissioners swore, they did not deem it advantageous to the institution to apportion any stock to the complainants, and that they considered the apportion-

1832.

CLARKE
v.
BROOKLYN
BANK.

ment as made most advantageous to the interests of the institution.

Mr. *Staples* and Mr. *S. A. Foot*, appeared for the complainants.

Mr. *N. F. Waring*, Mr. *H. W. Warner*, Mr. *P. W. Radcliffe*, and Mr. *Peter A. Jay*, for the different defendants.

*July 2, 1832.*

THE VICE-CHANCELLOR. The first question which the court has to decide in the present case is this: have the commissioners violated the provisions of the charter, in taking stock to themselves and distributing some to others, in the way they have done, supposing them to have acted in good faith?

This depends upon a right construction of the tenth section. Before considering its literal import, it may not be unprofitable to trace the origin of the provision which this section contains, and the probable occasion of its introduction. In 1825, the case of *Meads* v. *Walker*, 1 *Hopk. C. R.* 587, came before the court of chancery. It grew out of the circumstance of an excess of subscription to the capital stock of the Commercial Bank of Albany, then recently chartered, and the manner in which the commissioners distributed the stock; and it involved the question as to the power of the commissioners to take portions of the stock to themselves, and the making an arbitrary distribution of the remainder, thereby totally excluding some subscribers from all participation in the stock, in a case where the act of incorporation made no provision for the event of an excess of subscriptions beyond the limited amount of the capital. At the time it occurred, there was no instance of such a provision in any bank charter granted by this state—at least, none has fallen under my observation; and from the year 1825 to 1829, there appears to have been no new bank created in this state.

At the session of the legislature which commenced with the year 1829, the safety fund system was adopted; and at the same session, under that system, no less than eleven new banks were incorporated, and then, for the first time, the legislature gave

directions in relation to the distribution of the stock in case the subscriptions amounted to more than the capital. They probably remembered the difficulty in the case just mentioned, and which, if not the last, was almost the last banking corporation they had then created; and, hence, they deemed it advisable to prescribe the powers and duties of commissioners in all future cases. Accordingly, in the acts to incorporate the Bank of Ithaca, the Lockport Bank, and the Bank of Monroe, (being the first of the new series, and all of them passed on the same day, the 22d of April, 1829: see *Laws of 52 Sess. chap.* 210, 211, 212,) sections were introduced to meet the case of an excessive subscription. In two of these instances, namely, as to the Bank of Ithaca and the Bank of Monroe, these sections are precisely the same as the tenth section *now* under consideration. But, in the case of the Lockport Bank it is different; there, instead of the words " it shall be the duty of the " commissioners to apportion the same among the subscribers " thereto, in such manner as they shall deem most advan-" tageous to the interests of the institution," &c., it is declared, " in case there shall be subscribers to more than the amount, " &c., it shall be the duty of the commissioners to apportion " the same among the subscribers thereto, in rateable propor-" tion to the amounts subscribed by the respective indivi-" duals," &c. In other respects, the section is the same. And with regard to the other banks created within a few days afterwards, namely, The Merchants' Exchange, The Merchants' and Mechanics' of Troy, The Genesee, The National, The Ogdensburgh, and The Canal Bank of Albany, there is a section contained in the acts exactly similar to the provision relating to the Ithaca and Monroe banks; while the Whitehall and Wayne county banks, contain the same provision, in relation to a rateable apportionment, as is directed in the case of the Lockport Bank. It is apparent that all these bank charters are from the same model, only varying in the above respect. It was a new era in banking; and the legislature intended to put the charters upon the same footing. Indeed, it would seem as if the legislature established one form for all bills of this description; for, not only those passed at the time

we have mentioned, but all those subsequently passed, are almost literal copies of each other.

Amongst those passed in 1830 and 1831, I find but one in which the tenth section contains the direction to the commissioners to apportion the stock rateably. It is in the act to incorporate the Chatauque Bank, passed 18th of April, 1831. Whether any statutes passed at the last session of the legislature contain the same direction, I have not been able to ascertain. But, those already mentioned are sufficient to show how the legislature has made the distinction between a rateable apportionment of stock, in the given case where no discretion is to be exercised by the commissioners, and the grant of a discretionary power constituting them the judges of what will be most advantageous to the interests of the institution in respect to the distribution amongst subscribers where all cannot have the full quantity.

In giving these different directions, the legislature doubtless intended to accomplish one object : they intended to prevent a recurrence of the difficulty which had arisen in the case of the Commercial Bank of Albany, where there had been no express delegation of authority to the Commissioners, nor any specific mode of distributing the stock pointed out in the event of an excess of subscription. In that case, Chancellor *Sanford* acknowledged the difficulty of laying down any precise rule for the distribution. He held, that the Commissioners had erred in supposing they possessed an arbitrary power to effect a reduction by entirely rejecting some of the subscriptions, because, where the legislature is silent, and the power is to be inferred, it is not, as he says, a power merely arbitrary, but one which must be exercised consistently with principles of justice and equity. If fraud or error intervene, it subjects the case to the revision and control of courts of justice. Not so, however, where the legislature expressly confers a discretionary power on subordinate agents ; for, then the power must prevail, and nothing less than fraud will vitiate the acts of the agent. In this respect, he recognized the rule laid down by his predecessor, in *Haight* v. *Day*, 1 *J. C. R.* 18.

To obviate all difficulty on the subject, sections were intro-

duced into the charters then granted, and which have served as precedents in all subsequent enactments of the same kind, creating, in some, a discretionary power to be exercised by the commissioners and giving, in others, a positive direction to distribute the stock rateably in proportion to each individual subscription.

The present is a case of the first class; and it appears to be no longer a question, whether the commissioners are bound or can be compelled in cases like this and under such an authority as is here granted to make a rateable apportionment of the stock, as has been contended for on the part of the complainants. It is otherwise clearly laid down in *Haight* v. *Day*, where the distinction is pointed out; while the practice of the legislature since 1829, sometimes vesting commissioners with the power of exercising their judgment and discretion and sometimes directing the other mode to be pursued in the distribution of stock, clearly indicates that they are distinct in principle.

The only question, therefore, which can possibly arise upon the face of the law containing the grant of this discretionary power, is, whether any and what restrictions are laid upon it by the law itself in the event which has happened? In the first place, it may be observed, that if the subscriptions for stock do not exceed the amount of the capital, there is no room for the exercise of the judgment or discretion of the commissioners. They have only to give to every subscriber the number of shares for which he may choose to subscribe and pay. Their duty is then fulfilled. But when subscriptions, including the two hundred and fifty shares allowed to each commissioner, exceed the amount limited for the capital stock, then it becomes their duty to make the apportionment; and in doing so, they are to exercise their best judgment and discretion, looking only to the interest of the institution. The power given to them for this purpose is broad and general, subject, however, to one limitation or restriction, namely, that no person who subscribes for twenty shares or upwards shall be put off with less than twenty shares. The commissioners may give to some more, and to others just twenty shares, but to none a less number. In this consists the restriction or limit of their power.

But it might happen that, from the great number of subscri-bers for twenty shares and under, every person subscribing for twenty shares or upwards could not have twenty assigned to him, there not being stock enough to distribute to this extent. Then, what is to be done ? Is not the restriction to be taken off? It appears to me there is no alternative ; and hence the legislature have, in express terms, removed the restriction by superadding the clause " unless the subscription for twenty " shares or a less number shall, in the aggregate, exceed the " whole amount of stock." . This event has happened here ; and it necessarily follows, that the commissioners are not re-stricted to the duty of giving to each subscriber of twenty shares and upwards at least twenty shares. It is impossible *to do so.* How then were they to apportion the stock amongst *the* subscribers? The law has not declared in this charter, that a rateable apportionment, by a mathematical rule, shall be made, nor has it prescribed any other specific mode of doing it; but it has left it to the unrestricted and uncontrouled judgment of the commissioners, in order to consult the interests of the institution and apportion the stock amongst the subscribers in such manner as they may deem best. The words " apportion" and, " among," certainly do not require every subscriber should receive some stock. In order to give such a construction, there must be an interference with that power of the commis-sioners, which, in the event which has occurred, is to be re-garded as unlimited.

With respect to the shares of the commissioners : it appears to me the law is equally plain. Lest they should subscribe for or rather take to themselves an undue portion of the stock, to the prejudice, in some degree, of the community, especially of those who might have money to invest, the legislature have limited the number of shares which they shall be allowed to take in the first instance, in one event, and in that only : "if, without such allowance, the whole stock be taken up." The plain and obvious meaning, as shown by this part of the sen-tence is, that if the whole stock is taken up or subscribed for by others, the commissioners are allowed to take each two hundred.

and fifty shares for himself. I do not conceive they are put upon the same footing with ordinary subscribers. Their duty is to open a book for subscriptions, and if the whole stock is subscribed by other persons, then the commissioners are authorized to set apart two hundred and fifty shares apiece for themselves, and proceed to distribute the residue. They are, therefore, in any event, entitled to that number; and may take more provided the whole of the residue is not taken up.

This disposes of the case as far as the construction of the tenth section is concerned; and I see nothing in the proceedings or acts of the commissioners, either in taking stock to themselves or in not apportioning some stock to the complainants and other subscribers, which can possibly be considered a violation of its provisions.

Other questions have been made and discussed upon this motion, which my duty requires me to notice. Affidavits of five of the commissioners, in opposition to the bill, deny all fraud, corruption or undue partiality in the manner of apportioning or distributing the stock. But it is insisted, that enough appears to call for the interference of this court, and principally upon two grounds :—1. In the distribution, the commissioners apportioned stock to persons whom they knew were not subscribers on their own account, but on the part of others, or who had merely lent their names for the occasion, thereby enabling some individuals to obtain (by indirect means) more than twenty shares. As to this, the commissioners admit being informed, and that they believed divers persons, in this way, became beneficially interested in more than twenty shares, but they deny it was with their privity or procurement, or·that they had any understanding or agreement with any such persons. Although the commissioners knew of such a practice, yet, as they were not participators, but acted in good faith, I am at a loss to perceive how this court can interfere. If my construction is right, the law has not been violated by the mere fact of some persons having obtained more than twenty shares under the exercise of the commissioners discretion. 2. But the other ground is somewhat more formidable in appearance. The bill contains allegations based upon the information and belief of the com-

47

1832.

CLARKE
v.
BROOKLYN
BANK.

plainants in relation to eight hundred shares of the stock being directly or indirectly distributed to members of the legislature and other persons at Albany, to whom it had been promised before the charter was obtained, as a compensation for their services in assisting to procure it; but, whether the commissioners have not made use of this representation as a pretence for appropriating the eight hundred shares to themselves, the complainants say, they have no certain knowledge or information, and pray a discovery. The commissioners admit that about eight hundred shares were subscribed for and apportioned to persons whom, they have been informed and believe, intended to hold the same for the benefit of sundry persons at Albany, and elsewhere; but they deny the same were so apportioned in pursuance of any promise made before the charter was obtained, as a compensation for services rendered in assisting to procure the charter—they admit, however, that, as to some parts of the stock, it was apportioned because the persons supposed to be interested therein had been serviceable in obtaining the charter, and yet deny their taking any part in procuring the names of subscribers for such shares or in advancing the instalment or doing any thing to conceal the names of the persons for whom such stock was intended; also, they deny and disclaim any knowledge of the stock being apportioned to any member of the legislature or to any person or persons to whom it had been promised as a compensation for services in procuring the charter. The utmost, therefore, which the affidavits disclose is, that the commissioners were induced to apportion stock to some subscribers, upon the supposition of its being intended for persons at Albany, and elsewhere, who had been serviceable in obtaining the charter. Is this an evidence of corruption on the part of the commissioners or an illegality in itself? It must be borne in mind, we are here canvassing the conduct of the commissioners in relation to their receiving subscriptions for the stock, and as to the manner of distributing it; and not, whether improper or corrupt means have been used to obtain the charter of the bank. That is a matter which this court is not, and cannot be called upon to investigate. And with respect to the commissioners, I see

nothing in the disclosures to impeach the honesty of their mo-
tives.   They deemed it not improper to give to those, who
had been friendly to the incorporation, and who had rendered
some service and might be disposed to promote its interest,
the advantage, whatever it might be, of possessing some of the
stock at a par value.   This appears to me nothing more than
a show of friendly motive on their part, and not a proceeding
springing from a corrupt source ; especially as they deny, in.
the most unequivocal manner, that the apportionment and distri-
bution were fraudulently or corruptly made in any particular.

There is then no ground left upon which this court can in-
terfere.   With the exercise of the commissioners' judgment
over the subject matter confided to them, and within the scope
of their authority, this court has nothing to do : *so long as they
act in good faith and with pure and upright motives ; and I
am not at liberty to infer, against their positive denial, and from
the circumstances before me, that the commissioners have act-
ed otherwise.*

In addition to the foregoing considerations, several others
have been urged against the issuing of an injunction, and
against the right of the complainants to any relief after laying
by until the election for directors had taken place, and much
of the stock had changed hands.   I confess there appears to
be great force in the argument drawn from these facts ; but it
is unnecessary for me, at this time, to consider or to express
any opinion upon this part of the case.

For the other reasons, the motion must be denied, and with
costs.