THE PEOPLE, *ex rel.* Abel P. More and others, Com-
missioners &c., *vs.* THE COUNTY COURT OF JEFFERSON
COUNTY.

By an act of the legislature, passed in 1864, (*Laws of* 1864, *ch.* 577,) the relators
were appointed commissioners to drain certain lands lying on Black lake,
in the county of St. Lawrence, and its tributaries, who were to have the
necessary work performed, and to assess the expense upon the lands which
should, in the judgment of the commissioners, be benefited by the im-
provement, and as they should adjudge in proportion to the benefits and
improvements received thereby; such assessments to be made *pro rata*,
according to the value of such lands, as they should be appraised by the
commissioners. The act was amended by chapter 730 of the laws of 1865,
which authorized any person owning land in either of two towns therein
mentioned, which had been or should be assessed under the act of 1864, to
appeal to the county court of the county in which such land was situated;
and authorized and directed such court to review the assessment, on such
appeal, upon *such proofs as might be presented*, at the hearing; and empowered
it to *affirm, reverse, set aside* or *modify* such assessment, in any particular
wherein it was authorized by the act of 1864. It declared that the decision
of the county court should be final, upon the rights of the parties, except
that if the assessment was set aside because the *method* or *rule* of assessment
adopted by the commissioners was erroneous, the commissioners should pro-
ceed to make a new assessment, as required by the judgment.
The commissioners caused the surveys and estimates to be made; entered
upon the execution of the improvement, and assessed the amount of such
estimate upon the lands of divers individuals in the towns specified in the
statute; all of whom united in an appeal from the assessment, to the county
court of Jefferson county, asking that it should be set aside or modified, &c.
That court adjudged that the assessment upon the lands of, and against the
persons of, all and each of the appellants be set aside and vacated, with
costs of the appeal, to the appellants, on the ground that each and all of said
assessments were unauthorized by the statutes under which they were made.
*Held*, 1. That so far as the powers of the commissioners were concerned, the
whole proceeding being in derogation of the common law rights of the ap-
pellants, the act of 1864 was to be construed most liberally in their behalf,
for the preservation of their rights, and was to be taken strictly against the
commissioners; and that in cases of doubt, arising from its phraseology,
every proper intendment was to be taken most strongly in favor of the ap-
pellants, and against the commissioners.
2. That when to this was added the fact that no opportunity was given, by the
act, for the appellants to be heard before the commissioners, either by wit-
nesses, by counsel or in person, it must be absolutely clear that the legisla-
ture intended there should be no review upon the merits, except in the

The People *v.* The County Court of Jefferson County.

case of an erroneous *method* or *rule* of assessment, before the court could so construe the statute.

3. That it not being clear, from the act, whether the legislature intended that the expense should be assessed upon the lands in proportion to the amount of benefit to be received, without regard to the value of the respective pieces of land, or *pro rata*, in proportion to the value of the lands to be assessed, without regard to benefits, the court, if necessary, would adopt the construction which would be most consistent with justice, between the parties.

4. That although the commissioners had assessed the cost and expenses *pro rata* upon the value of the lands to be benefited, such an error would not call upon the court to set aside the assessment entirely; but would require a reassessment to be made, in proportion to benefits.

5. That it was clear that the legislature intended the costs, damages and expenses of the improvement should be borne and paid by those only who were to be benefited. That it was the lands to be benefited, that were to be assessed; and not the lands overflowed.

6. That although the discretion given to the commissioners was liberal, yet it was not an arbitrary one; and it was a discretion in determining what lands were benefited, and the extent of the benefit. That it was not intended they should assess lands which could not be benefited; nor was any such authority given to them; and if they included lands in their assessment which clearly were not benefited, they exceeded the authority vested in them.

7. That inasmuch as the county court had the right to review the assessment, and to vacate it as to lands not benefited, and as it had decided that none of the lands of any of the appellants were or could be benefited thereby, and had set it aside for that reason, this court should not reverse its decision; because, if the county court had jurisdiction of the question, its judgment should stand.

8. That the only question was, did the commissioners include the lands of the appellants without authority so to do; or, in other words, could the lands of any of the appellants be benefited by the improvements contemplated, or by any of them. And that the testimony before the county court abundantly supported the decision.

Independent of any express authority, commissioners invested with a discretion to carry out the intent of the legislature, whenever they manifestly do that which was not intended, whether honestly or dishonestly, do what is not authorized by the statute.

COMMON law certiorari directed to the county court, to review its decision, on appeal from an assessment made by the relators as commissioners for draining lands on Black lake and its tributary streams, in St. Lawrence and Jefferson counties.

The relators were commissioners appointed by an act of the legislature, in 1864, to drain certain lands lying on Black lake, in the county of St. Lawrence, and its tributaries, who were to have the necessary work performed, and to assess the expense upon the lands benefited by the improvement.

The statute (*Laws of* 1864, *ch.* 577, § 3) authorized the commissioners to excavate a channel in the bed of the Oswegatchie river, not exceeding one hundred feet in width, and of a depth not exceeding two feet and a half, from and below the debouche of Black lake, into the river, in the town of Oswegatchie, on the head of the Eel weir rapids, and in and so far down the rapids as they should judge necessary to the free flow and discharge of the waters permitted by the excavation. And it directed them, on the completion of such excavation, to dredge a channel over the shoal at or near Snake island, in Indian river, of sufficient width for boats to pass and repass, so far as to allow the average depth of water to flow and stand in such channel, and to admit the passing and repassing of boats, as before the excavation on Eel weir rapids.

Section 4 provided that, before entering on said excavation, they should cause a survey to be made and a map of all the lands on said Black lake and its tributaries, which, in their opinion, would be benefited by the work; which map should indicate the lots of land, the quantities thereof, the lines between them, and the owners of said land, so far as the same could be ascertained.

The 10th section prohibited the commissioners from impairing the navigation, as it then was, between Rossie, on Indian river, and Heuvelton on the Oswegatchie river, situated some nine or ten miles above the Eel weir rapids, and to that end authorized them to excavate the shoal places in the Oswegatchie, between Eel weir rapids and Heuvelton, for a width of not less than twenty-five feet; or to

construct dams with locks not less than seventy feet long, and not less than sixteen feet wide.

The 5th section directed the commissioners to cause an estimate to be made of the cost of the work, and the expenses and damages to private rights, if any, and to assess and levy the amount thereof upon the lands on said Black lake and tributaries thereof, or upon the owners thereof, which, in the judgment of the commissioners, would be benefited by said work, and as they should adjudge, in proportion to the benefits and improvements received thereby. It further provided that such assessments should be made, *pro rata*, according to the value of such lands, as they should be appraised by the commissioners. And the act provided for the collection of such assessments by sale of the lands, or so much thereof as might be necessary for that purpose, unless paid without such sales.

The act of 1864 was amended by chapter 730 of the laws of 1865, and it authorized any person owning lands in Alexandria, in the county of Jefferson, or in the town of Hammond, in the county of St. Lawrence, which had been, or should be, assessed under the 5th section of the act of 1864, and who should feel himself aggrieved in respect to such assessment, to appeal to the county court of the county in which such land was situate, and authorized and directed such county court to review such assessment, on such appeal, upon *such proofs as might be presented at the hearing;* and empowered it to *affirm, reverse, set aside* or *modify* such assessment, in any particular wherein it was not authorized by the act of 1864.

It declared that the decision of the county court should be final upon the rights of the parties, except that if the assessment was set aside, because the *method* or *rule* of assessment adopted by the commissioners was erroneous, the commissioners should proceed to make a new assessment, as required by the judgment.

It allowed any number to unite in one appeal, and authorized the court to hear them all together as one appeal, and to adjudge the rights of the several appellants in one decision.

The commissioners caused the surveys and estimates to be made; entered upon the execution of the improvement, and assessed the amount of such estimate upon the lands of divers individuals, and among others, lands situated in the town of Alexandria, in the county of Jefferson, lying, some of them, upon Butterfield lake, some upon Plessis creek, and some of them on Black creek, tributary waters of Black lake, and owned, severally, by John R. Griswold, Luther M. Hill, Henry S. White, Richard Crabb, Moses C. Jewett, Henry Bricklehaup, Charles Zoller, John Adams, George Smith, William Schreauber, John Norton, Romeo W. Marshall, William Spear, Aaron Peck, Barney Mc-Curtin, Eleazer D. Smith, Allen Cole and Rhoda Ann Sprague, for the amount, in the aggregate, of $531.54; all of whom afterwards duly united in an appeal from the assessment, to the county court of Jefferson county, asking that it should be set aside or modified, &c.

The appeal afterwards came on for trial before the county court; and after hearing the proofs and allegations of the appellants, and of the said commissioners, the court found and adjudged that the assessment upon the lands of, and against the persons of, all and each of the appellants be set aside and vacated, with costs of the appeal to the appellants, on the ground that each and all of said assessments were unauthorized by the acts of the legislature under which they were made.

The commissioners thereupon obtained a writ of certiorari, returnable in this court, to review that judgment.

*Brown & Hasbrouck,* for the relators.

*F. W. Hubbard,* for the county court.

The People *v.* The County Court of Jefferson County.

*By the Court,* FOSTER, J.   It is objected, on the part of the county court, that its judgment cannot be vacated, for the reason that the court had jurisdiction of the subject matter, and that upon this writ the court cannot review the decision of the inferior court upon the merits; and it is also insisted that the merits cannot be reviewed here, because the appellants, who are the persons interested, are not made parties to the proceeding.

These objections, in the view which I take of the case, are not very material, for I have come to the conclusion, not only that the act of 1865 conferred the power upon the county court, to review the assessment for the reasons alleged, but that the decision of that court, upon the merits, was correct.

The counsel for the relators insists, in substance, that as to all lands lying upon Black lake or its tributaries, their assessment was conclusive, so far as the right to assess them is concerned; and that whether they are really benefited or not, cannot be inquired into on the appeal.

The commissioners were, as before stated, authorized by the act of 1864, to excavate the channel of the Oswegatchie, on the head of Eel weir rapids, not, exceeding one hundred feet in width, and not exceeding two and a half feet below the debouche of Black lake, into the river, and so far dam said rapids, *as they should adjudge necessary* to the free flow and discharge, &c.   They were to make such surveys, and to employ such engineers, &c., to perform the work, as they should deem necessary.   They were to cause a survey of all the lands on said lake and its tributaries, which in their opinion would be benefited by the work, &c., and they were to file a copy thereof, &c.   They were to *cause an estimate of the cost of the work, and the expenses and damages to be made;* and they were to assess the whole upon such lands, "*which, in their judgment,* will be *benefited, and as they shall adjudge in proportion* to the *benefit and improvements received thereby;* and to make them,

*pro rata,* according to the value of such lands, as they shall be appraised by the commissioners; and they were to collect the money so assessed. In all this the land owners, who are assessed, had no opportunity to be heard before the commissioners. No notices were required to be given; no hearing provided for; no witnesses to be sworn before them, and nothing, so far as the language of that act is concerned, to control their action in either of the matters before mentioned, upon which they were to determine.

While that act alone was in force, and in the month of September, 1864, they made their surveys, maps and plans, for the excavation at Eel weir rapids. They caused to be made and filed, their survey and map of the lands, on said lake and its tributaries, and their assessments of them for the cost of the work, the expenses, and for damages, and commenced to excavate; and afterwards the amendment of 1865 was passed, authorizing the court to review such assessment on appeal, upon *such proofs* as might be presented at the hearing, and gave it power to *affirm, reverse, set aside* or *modify* it, in any particular wherein it is not authorized by the act of 1864; and that, except where the *method or rule of assessment* had been erroneous, such decision of the county court should be final; and that when such *method* or *rule* had been erroneous, the commissioners were to reassess, as adjudged by the court.

The cases cited for the relators are not very analogous to the one under consideration. In *Walker* v. *Devereaux,* (4 *Paige,* 229,) the question came up upon the distribution of the capital stock of the Utica and Schenectady Railroad Company, where the commissioners were authorized, in case of an excess of subscriptions to the stock, to apportion the same among the subscribers, in such manner as the *commississioners* should deem most advantageous *to the interests of the corporation.* There was a very large excess of subscriptions, and in the distribution many of the subscribers received no stock, and the question was whether

The People *v.* The County Court of Jefferson County.

it must not be so distributed that each subscriber should have a portion of it; and the court held that the whole stock might be distributed to a part of the subscribers only. It was a franchise granted by the legislature; and while they provided that no one of the commissioners or subscribers should receive more than a certain number of shares, in case there was an excess of subscriptions, yet that the object of the franchise was, not merely to give the benefits of it to any person who might subscribe, however great the number might be, but that the main object was to benefit the institution; and that the commissioners were clothed with absolute discretion in carrying out that object, except so far as specifically restricted by the act; and that no individual had any *right* to a portion of the stock, in case of an excess of subscription, unless the commissioners chose to give it to him. But in the same case the court lay down the rule, that where a discretion is to be exercised according to fixed and legal principles, by a body acting as a court, if those principles have been mistaken or violated, it is a proper case for review and correction by the proper tribunal.

The case of *Clarke* v. *The Brooklyn Bank* (1 *Edw. Ch. Rep.* 361) arose under like circumstances. That was a case of the distribution of the capital stock of the Brooklyn Bank, and was like that of the Utica and Schenectady Railroad; and the ruling of the court was also the same.

*The King ex rel. Scales* v. *The Mayor and Aldermen of London,* (cited from 3 *Barn. & Adol.* 255,) was a mandamus to the defendants to admit and swear in, as an alderman, M. Scales, who claimed to have been duly elected to that office. Among other things, the defendants alleged an immemorial custom on the part of the defendants, upon petition presented to them therefor, to examine into the election, qualifications and fitness of all persons claiming to be elected aldermen; and that upon such petition, in the case of the relator, they had decided and adjudged

him to be unfit for the office; and the court held the custom set out in the return to be valid in law.

In none of these cases were vested rights of any of the parties sought to be impaired or affected by the acts complained of; nor were proceedings in the nature of judgments obtained against them, *ex parte*, by the direction of the legislature, while in the last case the action of the defendants was in strict conformity to law; for that which has been the custom from time immemorial, becomes a right, and as much a legal right as though it was acquired in any other known manner. And while the extract from the manuscript opinion of Mr. Justice Hubbard, in *Baldwin* v. *Kelly*, is very good law, it has no application to this case, nor does it sanction the doctrine that the report of *commissioners* in *partition* is not, upon its coming in, to be examined and reviewed upon its merits; though it is true that it is impossible to review it as we would the report of a referee or the verdict of a jury. " They are," as Justice Hubbard says, " carefully selected," (and I may add, the *parties* are to be heard in such selection,) " to carry into effect *the judgment* of partition. They are officers of the court, and their duty is of a quasi-judicial nature. In the performance of their trust they are supposed to be guided mainly by a previous general knowledge of the subject, and also upon a thorough personal observation." How is it with the relators? What voice had the appellants in their appointment? Of what court were they officers? What court had pronounced the judgment which they were to carry out? Who had settled the rights of the parties concerned in the proposed improvement? And what evidence is there that previous to their appointment they had any general knowledge of the subject? The proofs before the county court, as well that of their own witnesses as the testimony on the part of the appellants, show that they egregiously erred in supposing that the

The People *v.* The County Court of Jefferson County.

lands of either of the appellants could be benefitted by the contemplated improvement.

The case of *McCluskey* v. *Cromwell*, (1 *Kern.* 593,) merely decides, that when a statute required a contractor with the State to execute a bond conditioned that he would pay all laborers employed by him on the work specified in his contract, he was not bound to pay the laborers employed by a person to whom he had sublet the work. I do not perceive that it has much application to the case before us.

In determining the meaning of the act of 1864, we are not to forget that, so far as the powers conferred upon the commissioners is concerned, the whole proceeding is in derogation of the common law rights of the appellants, and for that reason is to be construed most liberally in their behalf, for the preservation of their rights, and is to be taken strictly against the commissioners; so that in cases of doubt, arising from its phraseology, every proper intendment is to be taken most strongly in favor of the appellants and against the commissioners. And when to this is added that no opportunity is given by the act, for the appellants to be heard before the commissioners, either by witnesses, by counsel, or in person, it must be absolutely clear that the legislature intended there should be no review upon the merits, except in the case of an erroneous *method* or *rule* of assessment, before the court can so construe it.

It is not clear, from the act, whether the legislature intended that the expense should be assessed upon the lands in proportion to the amount of benefit to be received, without regard to the value of the respective pieces of land, or *pro rata* in proportion to the value of the lands to be assessed, without regard to benefit. Both forms of expression are used, and it is evident that there is an incongruity between them; and yet there being such incongruity, and the one being repugnant to the other, it seems to

me, if it be necessary, we should adopt the one which would be most consistent with justice, between the parties.

There is no reason why one of two persons, whose lands were benefited by the improvement in precisely the same amount, should be compelled to pay more towards it than the other, merely because his lands were of the most intrinsic value. And yet the commissioners, as appears from the case, assessed the cost and expenses *pro rata* upon the value of the lands to be benefited. Such an error, however, would not call upon us to set aside the assessment entirely, but would require a reassessment to be made, in proportion to benefits.

The phraseology of the act of 1865, relied upon by the counsel for the relators, does not, I think, bring this within the principles laid down in the cases which they have cited. I am not aware of any more pointedly in favor of the proposition for which they contend, and I cannot see how the narrow and restricted power of review of the county court, which they claim, can be found in the language of the amendment of 1865, and more especially when construed, as it should be, in connection with the act amended.

It is perfectly clear that the legislature intended the costs, damages and expenses of the improvement should be borne and paid by those only who were to be benefited. This not only appears from the whole statute, but it would be absurd to suppose the contrary. Did they intend to vest the commissioners with the sole and exclusive right, in their discretion, and *ex parte*, to determine who were to be assessed, as well as the amount of the assessment, upon all lands lying on Black lake and its tributaries; and that however clear it might appear, upon an appeal, that lands had been assessed which the legislature never intended should have been, that there can be no redress for the owner? The commissioners seem to suppose that if they included in their assessment only such lands as at some

The People *v.* The County Court of Jefferson County.

time of the year were overflowed, that that is enough; but I cannot find any language which authorizes the assessment of all such lands. It is the lands to be benefited that are to be assessed, and not the lands overflowed. No such criterion for determining what lands are benefited has been established by the legislature.

Doubtless at some points on the shores of Black lake, if not on its tributaries, the banks are bold and rocky, rising almost perpendicularly to a height far above where the floods ever reach, and where such lands continue to rise as they recede from the banks, and upon the construction contended for by the relators, if such lands were assessed by them, the owner could have no remedy. The mistake of the counsel is in supposing that the discretion of the commissioners was arbitrary.

The discretion given to the commissioners was no doubt liberal, but it was not an arbitrary one, and it was a discretion in determining what lands were benefited, and the extent thereof. It was not intended that they should assess lands which could not be benefited. No such authority was given to them; and if they included lands in their assessment which clearly were not benefited, they exceeded the authority vested in them, whether such lands were situated on Black lake or its tributaries, or elsewhere.

They were authorized to estimate the expense of lowering the river at the Eel weir rapids and in Indian river, and the expenses and damages. Now suppose they had estimated that cost at ten times as much as it would really amount to, and were about to let the contracts therefor at such extravagant rate, or were about to collect such assessment before letting the work; and suppose that in making such assessment, it was clear that the commissioners had exercised their best judgment; is it possible that the land owners, who were assessed, could have no appeal, but that they must submit to pay the extravagant sums so required of them, and whether the contracts were actually made or

not?   And it does not aid the construction of the relators, that as to this matter the commissioners are bound at least to refund to the assessed land owners any excess of funds which they may have in their hands.   The owners would have the right to prevent the extravagant sum from being collected of them.   Or, suppose that in improving the navigation from Rossie to Heuvelton, the commissioners should, in the exercise of their best judgment, adopt the plan of dams and locks, as provided for in the act, and they should adopt a material and style of work and finish for such improvements as would absorb the whole or a great portion of the value of all the land on Black lake and its tributary waters, would there be no redress to the land owners?   Could they not by appeal prevent such waste of their property?   It seems to me beyond doubt, that in either of these cases the land owners, by an appeal, could prevent the improper expenditure and assessment from being carried out; and yet, if as to the point now before us, there is no relief by appeal, then there could be none in the cases supposed; for the discretion given to the commissioners in regard to them, is just as large and arbitrary as it is in reference to what lands are to be assessed.

I think the case of *Le Roy* v. *The Mayor, &c.,* (20 *John.* 430,) supports the proposition that an assessment of persons or lands not benefited, in a case like the one before us, is an excess of authority on the part of the commissioners.   There, authority was given by law to construct sewers, and the expense thereof was to be assessed on the owners and occupants of the houses and lots intended to be benefited; and commissioners were appointed; and in making out their assessment they left out the names of persons who were intended to be benefited, and it was held that it invalidated the assessment, and that the court had power to review the assessment, and to establish the principle on which the assessment was to be made, and to compel the corporation to act on such principle.

The People *v.* The County Court of Jefferson County.

But, independent of any express authority, commissioners invested with a discretion to carry out the intent of the legislature, whenever they manifestly do that which was not intended, whether honestly or dishonestly, they do what is not authorized by the statute.

The only question then is, did the commissioners include the lands of the appellants without authority to do so; or, in other words, could the lands of any of the appellants be benefited by the improvements contemplated, or by any of them.

From the foregoing conclusions it would follow that, inasmuch as the county court had the right to review the assessment, and to vacate it as to lands not benefited, and as it has decided that none of the lands of any of the appellants were or could be benefited thereby, and has set it aside for that reason, we should not reverse its decision; because, if it had jurisdiction of the question, its judgment should stand.

But if I am wrong in this, the testimony before the county court abundantly supports the decision.

The waters of the Indian river and of Black creek empty into the head of Black lake, not far distant from each other, but at different points, and at a distance of twenty or twenty-five miles from the outlet of the lake and Eel weir rapids. They have no connection with each other, except that the waters of each unite in the lake. Black creek is a small stream, and there is a shoal or obstruction in its bed, of a permanent character, very near where it empties into the lake, and upon which, at low water, the depth was only about ten inches, so that the top of this shoal was at least one foot and eight inches above the level of the contemplated reduction at Eel weir rapids, and without removing the material which constituted the shoal, the water above it in the stream, at low water, could not be reduced more than ten inches.

Farther up Black creek, and below where Plessis creek

unites with it, is another shoal, filling the creek and extending down about one mile, with a firm gravel and clay bottom, and the bed of the creek there is about three and a half feet higher than the contemplated reduction of Black lake, and one foot higher than the ordinary level of the water in the lake, and upon which shoal, in ordinary water in the summer season, there is only about five or six inches of water trickling through the stones; and still higher up the stream there is another shoal of equal height, at the forks of Black and Plessis creeks.

It is apparent, therefore, that while these shoals remain, (and the act did not provide for their removal or reduction,) the land of the appellants could not be benefited by the improvement; for all the lands of the appellants were situated some miles above the upper shoal, and there are also other shoals on Plessis creek, below a portion of the lands of the appellants which are assessed; and in addition to those facts, the testimony of the witnesses, including at least one of the witnesses for the relators, shows that in their judgment the contemplated improvement could not benefit those lands.

The decision of the county court was correct, and the writ of certiorari should be quashed, with costs.

[ONONDAGA GENERAL TERM, October 1, 1867. *Morgan, Bacon, Foster* and *Mullin,* Justices.]