In the Matter of the Application of MICHAEL STOLTZ and Others, Petitioners, for an Order against WATER POWER AND CONTROL COMMISSION OF THE CONSERVATION DEPARTMENT OF THE STATE OF NEW YORK and Others, Members of Said Commission, Respondents.

Third Department, January 17, 1940.

*Wiggins & Faulkner* [*Russell Wiggins* and *Henry G. Arfmann* of counsel], for the petitioners.

*John J. Bennett, Jr., Attorney-General* [*Henry Epstein, Solicitor-General, Timothy F. Cohan, Assistant Attorney-General*, of counsel], for the respondents.

HILL, P. J.  A large number of petitioners seek a review under article 78 of the Civil Practice Act of an apportionment and assessment of the cost made by the Water Power and Control Commission of the Conservation Department of the State of New York under section 492 of the Conservation Law in connection with the so-called Wallkill Valley Drainage Improvement District.  The district was

formed in accordance with the provisions of chapter 348 of the Laws of 1935, which added sections 494-o, 494-p, 494-q, 494-r and 494-s to article 8█ of the Conservation Law. Thereunder the Commission is permitted to form, on its own motion, a drainage district in the event the United States government is to pay " the greater part of the cost of such work." Under article 8, as it existed previous to the amendment, only when the owners of swamp lands petitioned asking that a drainage district be formed did the Commission have power to form one. (§ 483.)

Chapter 348 was special legislation of a kind. The chronology of events indicates that it was passed with the thought of having work done upon the Wallkill project by the unemployed in the pay of the United States. The law became effective April 8, 1935. Two days later the Commission gave notice of its intention to form the district, consisting of an area approximately three by twelve miles, estimating that the cost payable by the landowners would be $75,000, with $50,000 additional for a survey. Concerning the latter the order forming the district stated: " It is probable that much if not all that cost will be met by the various relief agencies." The only opportunity for the 1,600 odd landowners to review the action of the Commission in forming the district was provided by section 494-p, whereunder, if the application therefor was made within ten days, an order of certiorari might be obtained. About a year after the district was formed the plans were revised by the Commission without consultation with the taxpayers, and the estimated cost to the district was increased to $250,000, which it was stated would be used for the following purposes: " Total cost of C. C. C. Camps, rights-of-way, spoil banks, access roads, gravel, rip-rap, protection of bridges, culverts, surveys for acquisition of land, administration, damages, contingencies and interest payments due before an assessment can be made," and the $50,000 for surveys, instead of being paid by relief agencies, as first stated, would likewise be charged to the property owners. The United States government did work in dredging, enlarging and straightening the channel of the Wallkill river, but the project was abandoned some time in 1937, and the Commission thereafter reported, " As things now stand, the primary project is incomplete; no work has been done on the secondary ditches; none has been suggested on the main laterals. * * * It is also true that the greatest immediate benefit accrues to land along the main cut-off ditch, even though this work is not complete."

The 1935 amendment makes applicable earlier enacted provisions of article 8 in connection with the assessment of claimed benefits.

The order of the Commission assessing $215,000 against the landowners is under review in this proceeding. The first sentence of section 492 reads: " The Commission shall apportion the cost of any authorized construction project on each and every parcel or part thereof to be served by the proposed work." Assessments are to be based on the benefits received by each parcel, and if the project is only partially completed, or if the land benefited be not cleared and in condition to take advantage of the benefits, the Commission may " make reasonable allowance for the length of time which must elapse before the benefit will accrue to any parcel," and if a parcel has previously been assessed for drainage improvements or if the owner has " contributed labor, materials or money to any such drainage work " the Commission may make proper allowance therefor, and, finally, " The Commission shall prepare a statement of this apportionment of cost, together with such changes as may have been made in the plans, estimates and other documents previously filed, shall file the same and give notice of such filing and a hearing thereon." The section contains much matter not recited above, but the general outline for the plan of assessment is stated. At the hearing above provided, those who were to be assessed should have been given the fullest opportunity to gain information and present objections, for under the special act of 1935 the taxpayers have been given no opportunity to check the official conduct of the Commission, and taxation without representation has ever been unpopular. In May, 1937, before the project was abandoned, the Commission, in compliance with section 490-a of the Conservation Law, prepared a volume entitled " Statement of Determination of Benefits," which recites that 1,624 parcels of land, aggregating 18,163 acres, having a value prior to drainage of $25 to $50 an acre, would take on a value ranging from $50 to $750 per acre, total appreciation being estimated at $9,080,817.10. This document, consisting of more than 100 pages, is a part of the return in this proceeding, but amounts to little more than a prophecy of an unrealized hope. However, the Commission seems to regard these hundreds of computations, prepared far away from the scene and having no relation to proven facts, as accomplishing something, as the return states, " The present proceedings start with a determination of benefits which is now final." The subject of the finality is not disclosed.

The later apportionment of costs prepared in January, 1938, is the determination under review. Petitioners assert that their rights have been violated to their prejudice in many particulars. Among them (1) the Commission in its answer pleads: " That no schedule of expenditures was made or considered and alleges that

the same is not required by law * * * " and " that there are no provisions for objections to items of cost or for audit of such items by the property owners and that in all these matters were germane to the discussion of the apportionment of cost " (*sic*). " Cost " (§ 492) is to be apportioned by the Commission. A schedule of items thereof is of concern to, and may be the subject of inquiry by, those who are to pay. The Commission incurred the expense acting in a representative capacity " on behalf of the district." (§ 494-q.) Neither the law of trusteeship and agency nor the doctrine of official accountability will permit it to assess an amount without disclosing, if inquiry be made, the items and purposes of the expenditures. The 1935 amendment is unconstitutional if in fact it does authorize the Commission to make an assessment against these property owners without making or considering schedules of expenditures, and unless the money expended accrued to the benefit of those who are to pay. (2) The Commission denies the assertions in the petition that it has failed to follow the plain provisions of the statute requiring credit to be given to an owner who has earlier contributed labor, material or money in connection with drainage of his parcel, but no proof to sustain the denial was given and petitioners' efforts to introduce evidence were curtailed unreasonably. (3) It is asserted in the petition that much of the land taxed has not been benefited, as it was not subject to inundation, did not need drainage and should not be taxed. This is denied by the Commission in its answer, but the evidence received indicates the truth of the allegation in the petition. The weight given to this evidence is shown by the following quotation from the hearing Commissioner's report to the Commission: " Many testify that their lands were never flooded by backwater of the Wallkill. Without questioning the honesty of these witnesses, it is proper to question their ability to determine such a complex matter, particularly under conditions which had not existed during their life times. To be of value such testimony should have been confined to conditions as they were before any drainage work was done (colonial times)." The statute provides, " The Commission shall apportion the cost * * * on each and every parcel or part thereof to be served by the proposed work." (§ 492.) If the land was not served an assessment could not be made thereunder. One has difficulty in taking seriously the quoted statement that the inundation of land is so complex a matter that one without knowledge of conditions in the colonial period is not qualified to testify. Lands which have not been flooded within the memory of the oldest inhabitants should not be taxed in anticipation of a return to conditions that existed during the paleozoic period or in

the later colonial times. (4) Petitioners assert that they were not given a fair hearing and not permitted to examine witnesses, which would have disclosed relevant facts. The hearing Commissioner ruled on the request for subpœnas, " I shall deny your request to issue subpœnas to anybody connected with the Commission. I should certainly be extremely loathe to have Col. Daley subpœnaed here, and I question very much whether it could be done. The hearing is on now and we will hear you." As to the manner in which the hearing required under the statute (§ 492) was conducted, the report from the hearing Commissioner to the Commission is enlightening, " Strict rules of evidence do not apply, it seems to me unquestioned that irrelevant material should be included and to be obvious the time spent (*sic*) in telling the Commission what it already knows is time wasted. On this basis, it is probable that all the testimony offered might have been excluded; certainly the testimony of the witnesses for whom subpœnas were asked should have been excluded had the witnesses been present."

There are numerous other errors highly prejudicial to the rights of these taxpayers. The opening sentence of the apportionment and assessment under review, if made intentionally, is naively frank: " Apportionment of the cost of a large drainage project is neither simple nor straightforward." These taxpayers were entitled to a straightforward hearing where the widest latitude is given to inquire concerning the Commission's stewardship of this great sum of money. This they have not had.

The assessment should be annulled and the matter remitted to the Commission, with costs.

BLISS and FOSTER, JJ., concur; HEFFERNAN and SCHENCK, JJ., dissent and vote to confirm the determination of the Commission for the following reasons: The decision of the Commission informing the district and its determination of benefits were reviewable by certiorari. Petitioners failed to avail themselves of that remedy and it is now too late for them to raise those questions. The sole issue before this court on this appeal is the apportionment of cost. There is ample evidence to sustain the determination of the Commission in that respect.

Determination of the Water Power and Control Commission annulled, with fifty dollars costs and disbursements, and matter remitted to the Commission for proceedings in accordance with the prevailing opinion.