In the Matter of WALTER R. STURR et al., Petitioners, against WATER POWER AND CONTROL COMMISSION OF THE CONSERVATION DEPARTMENT OF THE STATE OF NEW YORK et al., Respondents.

Third Department, November 10, 1943.

*Wiggins, Faulkner & Arfmann*, attorneys (*Henry G. Arfmann* of counsel), for petitioners.

*Watts, Oakes, VanderVoort & Bright,* attorneys (*William H. Fitzgerald* of counsel), for petitioner Estate of Ambrose S. Murray.

*Gurda & Weissman,* attorneys (Michael Gurda of counsel), for petitioner Gurda.

*Nathaniel L. Goldstein, Attorney-General* (*Orrin G. Judd, Solicitor-General; Timothy F. Cohan, Assistant Attorney-General* of counsel), for Water Power and Control Commission.

Bliss, J.  A previous apportionment of costs of these same drainage improvements in the Wallkill Valley Drainage Improvement District was annulled by this court on January 17, 1940 (*Matter of Stoltz* v. *Water Power & Control Comm.,* 258 App. Div. 440) and the matter was remitted.  Since then much additional evidence has been taken by the Commission and a new determination made which is the same in result as the previous one.

The Wallkill Valley Drainage Improvement District includes the so-called '' black dirt '' area or bottom lands of the Wallkill Valley in the towns of Goshen, Minisink, Warwick and Wawayanda in Orange County.  It is about twelve miles long and three miles wide and contains approximately twenty thousand acres.  It has lately and especially since the formation of the district become widely known as the '' onion center '' of the country.*  Frequent floods led the property owners, many of whom now oppose this assessment, to urge the formation of the district, to seek State and especially Federal financial assistance and the passage of appropriate legislation.  The district itself was formed on April 23, 1935, by the respondent Commission pursuant to Laws of 1935, chapter 348, which added sections 494-o to 494-s (now §§ 494-m to 494-q) both inclusive, to article VIII of the Conservation Law.  Point seems to be made by the petitioners that the formation of this district and the carrying on of the project was something forced upon them by State or national officials.  While the argument, even if true, would be quite beside the point here involved, it is only fair to say that the present record fails to sustain it and shows the contrary to have been the fact.

The district was legally established and a great deal of work done by Federal authorities under direction of a United

---

* (See '' Black Acres '', National Geographic Magazine, Nov. 1941.)

States Army officer, with Federal funds and the labor of the Civilian Conservation Corps. While the project is not completed it is apparent that the work already done has improved flood conditions, and has benefited the district as a whole. Likewise the final completion when complete benefits will be felt is just that much nearer realization and property values have risen on that account.

The Commission, after formation of the district and other necessary steps, proceeded to determine the benefits as required by the statute — the test being the difference in value of each parcel to be benefitted in its natural state and as though completely drained. Petitioners now seek to review this determination, although they made no effort to do so within the time required by the statute. Thus that determination is not now before us. The next step was the apportionment of cost. These costs were principally those incurred for necessary rights of way, easements, materials and engineering and amount in all to approximately $225,000 plus interest. This figure may be compared with the total expense of $4,300,000 supplied by the Federal government. The Commission first designed a complete system of drainage for the entire district and estimated the cost of such system. This was done in detail. Then the cost of all these ditches was apportioned and in case the total cost assessable on any parcel exceeded the total benefit to that parcel, the plans were modified to eliminate such excess. As the Federal government was constructing the main channel there was deducted from the total benefit to each parcel the amount assessable on that parcel for all drainage work except the main channel, leaving a residual benefit from the main channel, the estimated cost of which was then apportioned according to these residual benefits. The reason advanced for the adoption of this method is logical. Had this not been done, a parcel farthest removed from the ditch would have had to bear a share in whatever cost might be assessed against it, in considerably greater proportion than a similar parcel adjacent to the ditch and most immediately benefited thereby, which obviously would have been unjust. The Commission then apportioned the costs of the rights of way, spoil, and other expenses here under review, in the same percentages that it would have apportioned the construction cost of the main outlet ditch, had that cost been borne by the property owners instead of being paid by the Federal government. Credit was also properly given for drainage work already done.

We believe that the Commission adopted a method fairly within the statutory requirement. (Conservation Law, § 492.) The determination should be confirmed.

HILL, P. J., (dissenting). This is a review under article 78 of the Civil Practice Act of decisions made by the Water Power and Control Commission of the State concerning the Wallkill Valley Drainage Improvement District located in Orange County, N. Y. It is a consolidation of many proceedings brought for the same purpose. An earlier assessment which was identical with this one was annulled by this court (*Matter of Stoltz* v. *Water Power & Control Comm.*, 258 App. Div. 440). The petitioners assert that they at this time may review the acts of the Commission in forming the district, in determining the benefits and apportionment of costs, while the Attorney-General argues that the only matter before the court is the apportionment of costs prepared by the Commission, and that the determination of the zone of benefits may not be reviewed now for the reason that the time has expired. When the district was formed, it was to be determined only " in general terms, what lands will be benefited thereby " (L. 1935, ch. 348▌). The apportionment of costs " shall be based on the benefit to each such parcel as previously determined and generally shall be in proportion to such benefit ". (Conservation Law, § 492.) Under either view, inquiry may be made respecting inequality of the apportionment of the costs.

" The use of property for the drainage of swamp or agricultural lands is declared to be a public use ", and general but no special laws may be passed permitting the owners or occupants of swamp or agricultural lands to construct necessary drains, ditches and dykes upon the lands of others. (N. Y. Const. art. I, § 7, subd. [d].) Whether this is a public use under the Federal Constitution will not be discussed. The compensation for land so taken and the cost of the drainage may be assessed wholly or partly against " any property *benefited thereby* ". (N. Y. Const. *supra.*)

The Legislature, by chapter 348 of the Laws of 1935, provided for the formation by the Commission on its own motion, of drainage districts when the Government of the United States would pay the greater part of the cost of the work. This statute, amended by chapter 684 of the Laws of 1936, and chapter 710 of the Laws of 1943, now forms a part of article VIII of the Conservation Law, which governs generally the subject of drainage of lands in this State. It appears from the testimony and records of the Commission that the 1935 statute was enacted hurriedly

to permit the speedy formation of a district without a petition of landowners, as required by section 483 of the Conservation Law. The reason for haste was the then belief that it would be economically wise to secure the aid of the Civilian Conservation Corps (C.C.C.). The Commission, two days after the enactment of the statute, formed a district, and with like speed the C.C.C. took over. The hastily made plans were frequently changed. After only a small portion of the work was finished, Federal aid and assistance were withdrawn. The 1935 statute empowered the Commission " To acquire or. appropriate lands and rights in lands, including sites for camps and appurtenant facilities, access roads, borrow pits, quarries, spoil banks and all other necessary and proper matters, to incur obligations and to borrow money on behalf of the district, to employ the necessary personnel and generally to do whatever is necessary to carry out the proposed project or projects." A district formed under this statute was to be continued as a drainage improvement district as though formed upon petition. The apportionment and assessment of the expenses incurred by the Commission is the subject matter of this litigation. The appropriate provisions as to districts formed under article VIII of the Conservation Law by petition of ,the landowners are made applicable to the levying of assessments to pay the obligations incurred. (Conservation Law, § 494-o.)' The apportionment of costs is to be based on the benefit to the parcels benefited " and generally shall be in proportion to such benefit ". (Conservation Law, § 492.) The section provides the practice when lands not drained or benefited by ditches dug during the then current project later desire to connect. Any other apportionment would be in contravention of the State Constitution above quoted. ·

Whether or not the value of land has been increased by an improvement is ordinarily a question of fact. (*People ex rel. D. L. & W. R. R. Co.* v. *Wildy*, 262 N. Y. 109.) It is immaterial whether the land is owned by an individual, a church or a rail-road company. It is proper to levy an assessment unless it may be said that there is no possibility that the value of the land would be increased. (*Matter of City of New York* [*Juniper Ave.*], 233 N. Y. 387, 392.) It has been held that benefits arising from increase of business and population are too conjectural and fantastic for consideration, as such a theory would permit taxation for an improvement in a portion of the village or city remote from the land taxed. (*N. Y., N. H. & H. R. R. Co.* v. *Village of Port Chester*, 149 App. Div. 893, 895, affd. 210 N. Y. 600.)

The 1935 statute became effective April 8, 1935, and two days thereafter the Commission prepared a description and estimated the cost to the district to be $50,000 for surveys and $75,000 for "rights-of-way, easements, material and damages". The district is located in the towns of Goshen, Minisink, Warwick and Wawayanda, adjacent to the Wallkill River, and is about twelve miles long and three miles wide, containing 18,183 acres. In March, 1936, the Commission revised upward its estimates of cost to the district for rights of way assessments, material and damage from $75,000 to $250,000. The funds available for the workers under C.C.C. were exhausted before January, 1937. Thereafter some additional funds were appropriated by the United States Government, and the project was continued under contract. The work was finally abandoned prior to the summer of 1937. From the findings and from documents prepared by the Commission, the incompleteness of the project and inequality of benefits are shown: "This plan has been changed several times. * * * Actually little, if any, of the project as adopted was fully completed and the main cutoff ditch is of reduced dimensions in parts, but it is carrying an appreciable part of the flood flow of the Wallkill and is of corresponding benefit to the landowners. * * * The primary project is incomplete; no work has been done on the secondary ditches; none has been suggested on the main laterals. * * * It is also true that the greatest immediate benefit accrues to land along the main cutoff ditch, even though this work is not complete."

The findings, rulings and discussion disclose the manner in which the Commission made the assessments. The costs to be paid by the landowners were apportioned to the various parcels in the district "in the same proportion as the theoretical cost of the main drainage ditches would be apportioned". The assessment is a percentage figured upon the assumed benefit from all drainage work between colonial times when there was no artificial drainage, and some time in the dim future when theoretically complete and perfect drainage will be effected.

The only work which has been done is upon the main ditch which was designed to straighten the winding course of the Wallkill River and provide a new channel for waters in the valley bottom. In fact it provides an additional channel, as the winding river remains.

The Commission divided the area into six classes, designated Class A to and including Class F. It was assumed that all of the land had been cleared and was ready to cultivate, and that

all work had been done to perfect the drainage for all the land in the district, and that each owner had built upon his own lands the necessary small ditches for drainage into supposititious lateral ditches which theoretically would run into the non-existent secondary ditches, which would empty into the incomplete main ditch, and there was deducted an arbitrarily fixed amount, five per cent, of the difference in value between the undrained and the fully drained land, representing the cost of the small owner-built ditches. Some of these had been dug, others not, but each received the same allowance. The Constitution authorized the assessment of costs "against any property benefited" and the Legislature acting thereunder provided that the expenses should be assessed generally in proportion to the benefit to the land. (§ 492, *supra*.)

The Commission gave little consideration to section 492 (*supra*) which directs that the apportionment and assessment of costs are to be based upon the benefit to each parcel, and conducted the hearings in a manner indicating a belief that the assessment must be made upon theory that each parcel was equally benefited and the owner was required to pay a percentage of the amount which the Commission determined would be the increase in value between no drainage and complete drainage. Section 490-a directs the Commission to ascertain the benefit from complete drainage. The first sentence of that section is "After the final order forming a district has been recorded, the commission may proceed to make determination of the benefits which will accrue to the property in the district as the result of drainage." This information, when it is relevant, may be useful in fixing the amount of an assessment, but that it is not the assessment is indicated by another part of the section. "The commission may combine a proceeding for determination of benefits with a proceeding for apportionment of the cost of a construction project, as set forth in section four hundred and ninety-two of this article." Consideration was not given to benefits which had accrued from the work already done under the Federal aid project, but the apportionment was a percentage of the benefit which would have accrued if complete drainage had been effected. The main drainage ditch was valueless to thousands of acres of this land unless secondary ditches, laterals and the smaller ditches were completed. The hearing commissioner stated that evidence was not to be received as to benefits accruing to the land from the Federal aid project, the only drainage work which had been performed after the formation of the district. "We

are trying to determine the value of these lands as they would be, had no drainage work ever been undertaken in this area, and the value of these lands as they would be were they fully and completely drained." It appears frequently in the testimony that the value of the lands as they existed before any drainage was one extreme, and complete drainage the other. At one point it was said that the Commission desired to take proof as to conditions back one hundred twenty years, and at other remote times. The following is from the record: " MR. LATTIMER: * * * Now, my drainage does not go into the old Wallkill. * * * There has never been any water on my ground. Under those conditions I don't see where they can show they have benefited my property one penny's worth. MR. SUTER: Benefited it how? MR. LATTIMER: I can't raise a bit better crop now than I did ten years ago. MR. SUTER: How about 120 years ago? MR. LATTIMER: I wasn't raising then. No, I don't expect to 120 years from now either. I am going on what the conditions are now. MR. SUTER: We are talking about the conditions before any drainage was done in the district at all. That was before the canal was dug. Have you any idea what your land would be worth then? "

That the benefit received from a project is the basis for the assessment of costs has been stated frequently by the courts. *People ex rel. Parker* v. *Jefferson County Court* (55 N. Y. 604; 56 Barb. 136*) involves drainage of lands under an act passed in 1864. The opinion in the Court of Appeals contains this statement (p. 607): " This single case, with the acknowledgment of the commissioner that they fixed the benefit per acre at the same sum, notwithstanding the different character of the different parcels of property, may be regarded as showing that the commissioners adopted, as a rule of assessment, an apportionment per acre, and not, as they professed, an apportionment according to the benefit derived from the improvement. * * * The requirement of the statute was substantial, not formal, and an assessment per acre was not an assessment according to benefit, though disguised in that form. We are of opinion * * * that the duty of apportioning the assessment according to a real and not a formal judgment of benefit cannot be evaded without disregard of the law." And from the opinion in *Matter of Munn* (165 N. Y. 149, reversing 49 App. Div. 232) (p. 155): " Had the assessors imposed the assessment uniformly in proportion to the frontage of each lot when all were not benefited in like proportion that would have been an erroneous

* Sub nom. *People ex rel. More* v. *County Court of Jefferson County.*

principle, since all were not equally benefited. Indeed, such a principle of assessment has been held to be unconstitutional in certain cases by the Supreme Court of the United States. (*Norwood* v. *Baker,* 172 U. S. 269; *Conde* v. *City of Schenectady,* 164 N. Y. 258)." And from *Matter of City of New York* [*Pugsley Ave.*] (218 N. Y. 234, 240): " Where the conditions within the area of assessment are such that the improvement results in unequal benefits to different parcels some method must be adopted which will levy the assessment in proportion to the benefits received. * * * The basis of the assessment is the benefit derived from the improvement effected by the proceeding, and it is immaterial what theory or principle is adopted provided only that it shall meet the requirement of the statute and distribute the cost proportionately to the benefits received."

The determination required by section 490-a (*supra*) seems involved, but it might be useful if this drainage district had been formed following a petition by landowners and it was contemplated that improvements would be made year by year. The Wallkill district was formed, using the term in a broad sense, under a special act. This was recognized and stated by the presiding commissioner, Mr. Suter: " It must be remembered that this particular project was not carried out in the regular sequence of events laid down by Article 8 of the Conservation Law. Due to the fact that the work was being done by the Army and the C.C.C. Camps, a special act was passed which permitted the work to be started and bonds to be sold prior to the making of the determination of benefits and the apportionment of the costs of the particular project considered." We can take judicial notice that the Civilian Conservation Corps (C.C.C.) has ceased to exist, and the Army is engaged in quite another direction. It is not reasonable to assume that this project will be continued, and it is not a reasonable distribution of the costs already incurred to assess these lands upon a basis of the difference in value between no drainage and complete drainage. There is undisputed proof that hundreds of parcels of land, aggregating many thousands of acres, are not benefited by the work, labor and services upon the project. A sketchy outline of expenditures has been exhibited. It includes some $38,000 for engineering payroll and engineering expenses; legal and recording fees about $10,000; camp site rental, $20,190; land for construction and spoil, $88,535; gravel, stone, pipe and bridges slightly over $40,000; interest charges and a few other small items. A portion of these items possibly may

be properly charged to the entire district, others, and a great majority, pertain only to the work done upon the main channel which benefits only a portion of the land. The statute contemplates that the owners of land not benefited by a ditch, the cost of which is being collected, shall not be required to pay until at some later date, if ever, they desire to drain their lands into the constructed ditch. " In that case the lands not sharing in the cost shall not be drained until they have asked that their share of the cost be apportioned to them and such apportionment has been made as provided above. In that case the commission shall make suitable provision for reimbursement or credit to the owners of property which bore the cost of such improvement in the first instance." (Conservation Law, § 492.)

The Commission recognized that this project was ended, as shown by the last sentence of the eighth finding, which is an excuse for not reducing the assessment on thousands of acres of uncleared and uncultivated land. " No specific time allowance for clearing and bringing the land under cultivation was herein made since there was no assurance that, nor could anyone predict when, the landowners would ask for additional work needed to complete the drainage system." An inequitable and unfair plan for the distribution of costs has been adopted. It violates both the State Constitution and the " special act " under which this project was commenced. Should landowners not now benefited desire to take advantage of the facilities already constructed, they then may be required to contribute to the cost, and those now paying will receive a proper refund, as earlier detailed.

The determination of the Commission should be annulled and the matter remitted to the Commission to assess the costs on the several parcels of land in the district in proportion to the benefit each has received.

HEFFERNAN and SCHENCK, JJ., concur with BLISS, J.; HILL, P. J., dissents in an opinion in which CRAPSER, J., concurs.

Determination confirmed, without costs.